**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| NOAH BREEDLOVE, on behalf of himself and all others similarly situated, | Case No. |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| NEXTGEN HEALTHCARE, INC., and NEXTGEN HEALTHCARE INFORMATION SYSTEMS, LLC, d/b/a NEXTGEN HEALTHCARE. | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff, Noah Breedlove, on behalf of himself and all others similarly situated, states as follows for his class action complaint against Defendants, NextGen Healthcare, Inc., and NextGen Healthcare Information Systems, LLC., d/b/a NextGen Healthcare ("NextGen" or "Defendant"):

### INTRODUCTION

1.     Between March 29, 2023, and April 14, 2023, NextGen, a healthcare

management system and electronic health record software services company, headquartered in Georgia, lost control over its computer network and the highly private information stored on the computer network in a data breach perpetrated by cybercriminals ("Data Breach"). On information and belief, the Data Breach's impact has been enormous, affecting at least 1,049, 375 consumers.

2.      NextGen's breach differs from typical data breaches because it affects consumers who had no relationship with NextGen, never sought one, and never consented to NextGen's collecting and storing their information.

3.      On information and belief Data Breach began on or around March 29, 2023, and was allowed by Defendant to continue until April 14, 2023, at least 17 days later. Despite having discovered the Data Breach on March 30, 2023, Defendant failed to mitigate or prevent the Breach for another 15 days.

4.      Following an internal investigation that first began on March 30, 2023, as the Breach was ongoing, Defendant learned cybercriminals gained unauthorized access to consumers' personally identifiable information ("PII").

5.      On information and belief, cybercriminals bypassed Defendant's inadequate security systems to access consumers' PII in its computer systems.

6.      On or about April 28, 2023, NextGen finally notified state Attorneys General and many Class Members about the widespread Data Breach ("Breach

2

Notice") an example of which is attached as **Exhibit A**.   However, NextGen has not yet completed notice and continues to notify breach victims.

7.     Defendant's Breach Notice obfuscated the nature of the breach and the threat it posted—refusing to tell its victims how many people were impacted, how the breach happened, or why it took the Defendant almost a month after discovering the Breach to begin notifying victims that hackers had gained access to highly private PII.

8.     Defendant's failure to timely detect and report the Data Breach made its victims vulnerable to identity theft without any warnings to monitor their financial accounts or credit reports to prevent unauthorized use of their PII.

9.     Defendant knew or should have known that each victim of the Data Breach deserved prompt and efficient notice of the Data Breach and assistance in mitigating the effects of PII misuse.

10.     In failing to adequately protect consumers' information, adequately notify them about the breach, and obfuscating the nature of the breach, Defendant violated state law and harmed an unknown number of its current and former consumers.

11.     Plaintiff and members of the proposed Class are victims of Defendant's negligence and inadequate cyber security measures. Specifically, Plaintiff and

members of the proposed Class trusted Defendant with their PII. But Defendant betrayed that trust. Defendant failed to properly use up-to-date security practices to prevent the Data Breach.

12.    Plaintiff Noah Breedlove is a Data Breach victim.

13.    Accordingly, Plaintiff, on his own behalf and on behalf of a class of similarly situated individuals, brings this lawsuit seeking injunctive relief, damages, and restitution, together with costs and reasonable attorneys' fees, the calculation of which will be based on information in Defendant's possession.

## PARTIES

14.    Plaintiff, Noah Breedlove, is a natural person and citizen of Ohio, residing in Akron, Ohio, where he intends to remain. Mr. Breedlove is a Data Breach victim, receiving NextGen's Breach Notice on May 8, 2023.

15.    Defendant, NextGen, is a Delaware and Georgia corporation with its principal place of business at 3565 Piedmont Road Northeast, Building 6, Suite 700, Atlanta, GA, 30305.

## JURISDICTION & VENUE

16.    This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs; there are

more than 100 members in the proposed class; Plaintiff and Defendant are citizens of different states.

17.     NextGen is incorporated in Delaware and maintains its principal place of business in 3565 Piedmont Road Northeast, Building 6, Suite 700, Atlanta, GA, 30305. NextGen is thus a Delaware and Georgia citizen.

18.     This Court has personal jurisdiction over NextGen because it is a citizen in this District and maintains its headquarters and principal place of business in this District.

19.     Venue is proper because NextGen maintains its headquarters and principal place of business in this District.

## BACKGROUND FACTS

*NextGen*

20.     On information and belief, NextGen is a corporation headquartered Georgia, providing practice management systems and electronic health record software services to healthcare providers. According to its website, NextGen's services and software products include "award winning, cloud based Electronic Health Records and practice management platform" that "were top ranked [] for the

sixth consecutive year." [1] NextGen boasts a total annual revenue of $596.4 million.[2]

21.    NextGen's software and management services are specialized for healthcare providers who oversee highly sensitive data. NextGen thus must oversee, manage, and protect the PII of its clients' patients.

22.    On information and belief, these third-party consumers, whose PII was collected by NextGen, do not do any business with NextGen.

23.    After collecting its consumers' PII, NextGen maintains the PII in its computer systems.

---

[1] NextGen, https://www.nextgen.com/ (last visited May 9, 2023).
[2] NextGen Healthcare Revenue, Zippia, https://www.zippia.com/nextgen-healthcare-careers-32874/revenue/ (last visited May 9, 2023).

24.     In working with third party consumers' highly sensitive data, NextGen advertises that it employs "world class security"[3] to protect the information stored



### The right data now

Securely exchange health information and connect disparate systems across a patient's entire spectrum of care, easily. Better interoperability is defined by capabilities that boost speed, security, cost-effectiveness, and compliance. Get the data you need when and where you need it.



### Secure hosting with AWS

Focus on patient care, not IT management. Scalable, cloud-based hosting services can help reduce the burden of health IT maintenance, speed implementations, simplify upgrades, and cut technology costs. Amazon Web Services (AWS) offer world-class security capabilities and system performance.

on its systems:

25.     NextGen also claims that, along with the "world class security capabilities" of its software products and services, its clients are simultaneously able to "reduce the cost of managing and maintaining [its] IT infrastructure", promising

### Better cost control

Through cloud-hosting, implementation, and around-the-clock professional support, your healthcare organization can reduce the cost of managing and maintaining your IT infrastructure. Hospitals and other health systems can significantly reduce hardware, software licenses, and training spending—without compromising on enterprise-level interoperability

---

[3] NextGen Healthcare, https://www.nextgen.com/ (last visited May 9, 2023).

"hospitals and other health systems [the ability to] significant reduce [] training spending" on its IT and security services:

26.     In its Privacy Policy, Defendant promises that it "use[s] reasonabl[e] and appropriate security measures designed to protect the personal information [it] obtain['s] from unauthorized alteration, loss, disclosure, or use, including technological, physical, and administrative controls over access to the systems [it] use[s] to provide the Company Site and [its] products and services."[4]

27.     As a self-proclaimed leader of providing software and management services to healthcare companies and handling highly sensitive aspects of its clients' business, NextGen understood the need to protect its client's consumers data and prioritize its data security.

28.     Despite recognizing its duty to do so, on information and belief, NextGen has not implemented reasonably cybersecurity safeguards or policies to protect its consumers' PII or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, NextGen leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to

---

[4] NextGen, Privacy Policy, chrome-
extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.nextgen.com/privacy-
policy#:~:text=We%20use%20reasonably%20and%20appropriate,and%20our%20products%20and%20services.
(last visited May 9, 2023).

consumers' PII.

***NextGen Fails to Safeguard Consumers' PII***

29.    Plaintiff is unsure how NextGen got his information but assumes a healthcare provider received treatment from NextGen with his PII, including but not limited to his name, date of birth, address, and Social Security Number.

30.    On information and belief, NextGen collects and maintains consumers' PII in its computer systems.

31.    In collecting and maintaining the PII, NextGen implicitly agrees it will safeguard the data using reasonable means according to its internal policies and federal law.

32.    According to the Breach Notice, NextGen claims to have been "alerted to suspicious activity on [its] NextGen Office system" on March 30, 2023. Exh. A.

33.    On information and belief, NextGen claims that the cybercriminals were able to gain access to its database by using NextGen's client credentials. [5]

34.    In other words, Defendant's investigation revealed that its network had been hacked by cybercriminals and that Defendant's inadequate cyber and data security systems and measures allowed those responsible for the cyberattack to

---

[5] Securityweek, https://www.securityweek.com/1-million-impacted-by-data-breach-at-nextgen-healthcare/ (last visited May 9, 2023).

obtain files containing a treasure trove of thousands of NextGen's consumers' personal and highly private PII.

35.    Despite its duties and alleged commitments to safeguard PII, NextGen does not follow industry standard practices in securing consumers' PII, as evidenced by the Data Breach.

36.    In response to the Data Breach, NextGen contends that it has or will be taking "measures to contain the incident, including resetting passwords, and further reinforcing the security of [its] systems." Exh. A. Although NextGen fails to expand on what these alleged "further reinforcing" of its systems are, such steps, as well as the step to regularly reset passwords, should have been in place before the Data Breach.

37.    Through its Breach Notice, NextGen also recognized the actual imminent harm and injury that flowed from the Data Breach, so it encouraged breach victims to "remain vigilant by reviewing account statements and credit reports closely." Exh. A.

38.    On information and belief, NextGen has offered two years of complimentary credit monitoring services to victims during that time, which does not adequately address the lifelong harm that victims will face following the Data Breach. Indeed, the breach involves PII that cannot be changed, such as Social

Security numbers.

39.     Even with only two years of credit monitoring, the risk of identity theft and unauthorized use of Plaintiff's and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

40.     Cybercriminals need not harvest a person's Social Security number or financial account information in order to commit identity fraud or misuse Plaintiff's and the Class's PII. Cybercriminals can cross-reference the data stolen from the Data Breach and combine with other sources to create "Fullz" packages, which can then be used to commit fraudulent account activity on Plaintiff's and the Class's financial accounts.

41.     On information and belief, NextGen failed to adequately train its IT and data security employees on reasonable cybersecurity protocols or implement reasonable security measures, causing it to lose control over its consumers' PII. Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII.

***The Data Breach was a Foreseeable Risk of which Defendant was on Notice.***

42.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare

industry preceding the date of the breach.

43.    In light of recent high profile data breaches at other healthcare partner and provider companies, NextGen knew or should have known that their electronic records and consumers' PII would be targeted by cybercriminals.

44.    Indeed, this is the second Data Breach incident NextGen has suffered in less than six months.[6]

45.    In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020. [7] The 330 reported breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020. [8]

46.    Indeed, cyberattacks against healthcare and healthcare adjacent industries have become increasingly common for over ten years, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing

---

[6] NextGen Healthcare Cyberattack exposes Patient data for nearly 17 days, The Cyber Express, https://thecyberexpress.com/web-stories/top-5-iot-security-risks-in-2023/ (last visited May 9, 2023).
[7] 2021 Data Breach Annual Report, ITRC, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.wsav.com/wp-content/uploads/sites/75/2022/01/20220124_ITRC-2021-Data-Breach-Report.pdf (last visited May 9, 2023).
[8] Id.

sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[9]

47.     Cyberattacks on medical systems and healthcare partner and provider companies like Defendant's have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive. . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[10]

48.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including NextGen.

**Plaintiff's Experience and Injuries**

49.     Mr. Breedlove received the NextGen's breach notice on or about May 8, 2023. He is unsure why Defendant is in possession of his PII.

50.     But no matter why NextGen's possesses Mr. Breedlove's PII, it has a duty to safeguard his information according to its internal policies and state and federal law.

---

[9] Gordon M. Snow Statement, FBI https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector (last visited May 9, 2023).
[10] Secret Service Warn of Targeted, Law360, https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited May 9, 2023).

51.     NextGen deprived Mr. Breedlove of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify his about it for almost a month.

52.     Indeed, Plaintiff experienced an increase in spam texts and phone calls since the Data Breach, suggesting that his information has been placed in the hands of cybercriminals.

53.     Plaintiff does not recall ever learning that his PII was compromised in a data breach incident, other than the breach at issue in this case.

54.     As a result of the Data Breach and the recommendation of Defendant's Notice Mr. Breedlove has spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Notice of Data Breach, and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

55.     Mr. Breedlove has attempted to sign up for Defendant's credit monitoring service but was unable to as the activation code provided by Defendant was invalid.

56.     Mr. Breedlove has and will spend considerable time and effort monitoring his accounts to protect himself from identity theft. Mr. Breedlove fears for his personal financial security and uncertainty over what PII exposed in the Data

Breach. Mr. Breedlove has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

57.   Plaintiff suffered actual injury from the exposure of his PII —which violates his rights to privacy.

58.   Mr. Breedlove has suffered actual injury in the form of damages to and diminution in the value of his PII —a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

59.   Mr. Breedlove has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties and possibly criminals.

60.   Mr. Breedlove has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

61.     Plaintiff and members of the proposed Class have suffered injury from the misuse of their PII that can be directly traced to Defendant.

62.     The ramifications of Defendant's failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal information such as that person's name, date of birth, Social Security number, or driver's license number, without permission, to commit fraud or other crimes.

63.     The types of PII compromised and potentially stolen in the Data Breach is highly valuable to identity thieves. The consumers' stolen PII can be used to gain access to a variety of existing accounts and websites to drain assets, bank accounts or open phony credit cards.

64.     Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

65.     Identity thieves can also use the stolen data to harm Plaintiff and Class members through embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits.

A Presidential Report on identity theft from 2008 states that:

> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health- related or criminal record fraud, face other types of harm and frustration.
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

66.    As a result of Defendant's failure to prevent the Data Breach, Plaintiff and the proposed Class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

a.  The loss of the opportunity to control how their PII is used;

b.  The diminution in value of the PII;

c.  The compromise and continuing publication of their PII;

17

    d.  Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

    e.  Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

    f.  Delay in receipt of tax refund monies;

    g.  Unauthorized use of stolen PII; and

    h.  The continued risk to their PII, which remains in the possession of Defendant and is subject to further breaches so long as Defendant fails to undertake the appropriate measures to protect the PII in their possession.

67.    Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

68.    The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen PII openly and directly on various "dark web" internet

websites, making the information publicly available, for a substantial fee of course.

69.    It can take victims years to spot identity or PII theft, giving criminals plenty of time to use that information for cash.

70.    One such example of criminals using PII for profit is the development of "Fullz" packages.

71.    Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

72.    The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and the Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other members of the proposed Class's stolen PII is being misused,

and that such misuse is fairly traceable to the Data Breach.

73.     Defendant disclosed the PII of Plaintiff and the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiff and the Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

74.     Defendant's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, as evidenced by its complete failure to prevent malware in its systems, demonstrates a willful and conscious disregard for privacy, and has exposed PII of Plaintiff and members of the proposed Class to unscrupulous operators, con-artists, and criminals.

75.     Defendant's failure to properly notify Plaintiff and members of the proposed Class of the Data Breach exacerbated Plaintiff's and the Class's injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant failed to adhere to FTC guidelines.***

76.     According to the Federal Trade Commission ("FTC"), the need for data

security should be factored into all business decision-making. To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Defendant, should employ to protect against the unlawful exposure of PII.

77.   In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business. The guidelines explain that businesses should:

      a.   protect the sensitive consumer information that they keep;

      b.   properly dispose of private information that is no longer needed;

      c.   encrypt information stored on computer networks;

      d.   understand their network's vulnerabilities; and

      e.   implement policies to correct security problems.

78.   The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

79.   The FTC recommends that companies not maintain information longer than is needed for authorization of a transaction; limit access to sensitive data;

require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

80.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

81.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumers' PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant's Offer of Credit Monitoring is Inadequate***

82.    At present, NextGen has offered merely two years of free credit monitoring during that time, provided by Experian, to breach victims.

83.    As previously alleged, Plaintiff's and the Class Members' PII may exist on the Dark Web and in the public domain for months, or even years, before it is used for ill gains and actions. With only two years of monitoring, Plaintiff and Class

Members remain unprotected from the real and long-term threats against their personal, sensitive, and private data.

84.     Therefore, the "monitoring" services offered by NextGen are inadequate, and Plaintiff and Class Members have a real and cognizable interest in obtaining equitable relief, in addition to the monetary relief requested herein.

## CLASS ACTION ALLEGATIONS

85.     Plaintiff brings this action pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

86.     Plaintiff sues on behalf of himself and the proposed Class ("Class"), defined as follows:

> **All individuals in the United States whose PII was accessed without authorization in the NextGen Data Breach, including all those who received a notice of the Data Breach.**

87.     Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

88.     Plaintiff reserves the right to amend the class definition.

89.     This action satisfies the numerosity, commonality, typicality, and

adequacy requirements for suing as representative parties:

90.     **Numerosity**. Plaintiff is representative of the proposed Class, consisting a staggering 1,049, 375 members, far too many to join in a single action;

91.     **Ascertainability**. Class members are readily identifiable from information in Defendant's possession, custody, and control;

92.     **Typicality.** Plaintiff's claims are typical of Class member's claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

93.     **Adequacy.** Plaintiff will fairly and adequately protect the proposed Class's interests. Their interests do not conflict with Class members' interests, and they have retained counsel experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf, including as lead counsel.

94.     **Commonality.** Plaintiff's and the Class's claims raise predominantly common fact and legal questions that a class wide proceeding can answer for all Class members. Indeed, it will be necessary to answer the following questions:

> a. Whether Defendant had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendant was negligent in maintaining, protecting, and securing PII;

d. Whether Defendant breached contract promises to safeguard Plaintiff and the Class's PII;

e. Whether Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. Whether Defendant's Breach Notice was reasonable;

g. Whether the Data Breach caused Plaintiff's and the Class' injuries;

h. What the proper damages measure is; and

i. Whether Plaintiff and the Class are entitled to damages, treble damages, or injunctive relief.

95. Further, common questions of law and fact predominate over any individualized questions, and a class action is superior to individual litigation or any other available method to fairly and efficiently adjudicate the controversy. The damages available to individual plaintiffs are insufficient to make individual lawsuits economically feasible.

## COUNT I
### Negligence
### (On Behalf of Plaintiff and the Class)

96.    Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

97.    Plaintiff and members of the Class entrusted their PII to NextGen. Defendant owed a duty to Plaintiff and the Class to exercise reasonable care in safeguarding and protecting their PII and keeping it from being compromised, lost, stolen, misused, and or/disclosed to unauthorized parties. This duty included, among other things, designing, maintaining, and testing Defendant's security systems to ensure the PII of Plaintiff and the Class was adequately secured and protected, including using encryption technologies. Defendant further had a duty to implement processes that would detect a breach of its security system in a timely manner.

98.    NextGen was under a basic duty to act with reasonable care when it undertook to collect, create, and store Plaintiff's and the Class's PII on its computer system, fully aware–as any reasonable entity of its size would be–of the prevalence of data breaches and the resulting harm such a breach would cause. The recognition of Defendant's duty to act reasonably in this context is consistent with, *inter alia*, the Restatement (Second) of Torts § 302B (1965), which recounts a basic principle: an act or omission may be negligent if the actor realizes or should realize it involves

an unreasonable risk of harm to another, even if the harm occurs through the criminal acts of a third party.

99.    Defendant knew that the PII of Plaintiff and the Class was information that is valuable to identity thieves and other criminals. Defendant also knew of the serious harms that could happen if the PII of Plaintiff and the Class was wrongfully disclosed.

100.   By being entrusted by Plaintiff and the Class to safeguard their PII, Defendant had a special relationship with Plaintiff and the Class. Plaintiff's and the Class's PII was provided to NextGen with the understanding that Defendant would take appropriate measures to protect it and would inform Plaintiff and the Class of any security concerns that might call for action by Plaintiff and the Class.

101.   Defendant breached its duty to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class members' PII by failing to adopt, implement, and maintain adequate security measures to safeguard that information, despite failures and intrusions, and allowing unauthorized access to Plaintiff's and the Class's PII.

102.   But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and the Class, their PII would not have been compromised, stolen, and viewed by unauthorized persons. Defendant's negligence was a direct and legal

cause of the theft of the PII of Plaintiff and the Class and all resulting damages.

103.   The injury and harm suffered by Plaintiff and the Class members was the reasonably foreseeable result of Defendant's failure to exercise reasonable care in safeguarding and protecting Plaintiff's and the Class members' PII.

104.   As a result of Defendant's failure, the PII of Plaintiff and the Class were compromised, placing them at a greater risk of identity theft and subjecting them to identity theft, and their PII was disclosed to third parties without their consent. Plaintiff and Class members also suffered diminution in value of their PII in that it is now easily available to hackers on the Dark Web. Plaintiff and the Class have also suffered consequential out of pocket losses for procuring credit freeze or protection services, identity theft monitoring, and other expenses relating to identity theft losses or protective measures.

## COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiff and the Class)

105.   Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

106.   Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard

Plaintiff's and the Class's PII.

107.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect customer information. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the members of the Class's PII.

108.   Defendant breached its respective duties to Plaintiff and Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

109.   Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its consumers, which is recognized by laws and regulations including but not limited to common law. Defendant were in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

110.   Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

111.   Defendant violated its duty under Section 5 of the FTC Act by failing

to use reasonable measures to protect Plaintiff's and the Class's PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

112.   The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

113.   But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and members of the Class, Plaintiff and members of the Class would not have been injured.

114.   The injury and harm suffered by Plaintiff and members of the Class were the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that Defendant was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

115.   Had Plaintiff and the Class known that Defendant did not adequately protect their PII, Plaintiff and members of the Class would not have entrusted Defendant with their PII.

116.   Defendant's various violations and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

117.   As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of PII; harm resulting from damaged credit scores and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling them to damages in an amount to be proven at trial.

118.   Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class members have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Ne fails to undertake appropriate and adequate measures to protect their PII in its continued possession.

## COUNT III
### Invasion of Privacy
### (On Behalf of Plaintiff and the Class)

119.   Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

120.   Defendant publicized private details and facts not generally known to the public, not publicly available, and not of legitimate public concern about Plaintiff and the Class Members by disclosing and exposing Plaintiff's and the Class Members' PII to enough people that it is reasonably likely those facts have and/or will become known to the public at large, including, without limitation, on the dark web and elsewhere.

121.   The disclosure of consumers' full names, Social Security numbers, date of birth, and full address, is particularly harmful and would be offensive to a reasonable person of ordinary sensibilities.

122.   Defendant has a special relationship with Plaintiff and the Class Members and Defendant's disclosure of PII is certain to embarrass them and offend their dignity. Defendant should appreciate that the cyber-criminals who stole the PII would fraudulently misuse that PII, and further sell and disclose the data. That the original disclosure is devastating to the Plaintiff and the Class Members, even though it originally may have only been disclosed to one person or a limited number of cyber-

criminals, does not render it any less a disclosure to the public-at-large considering that said non-public information is now made public, and cannot be secured again.

123.   The tort of public disclosure of private facts is recognized in Georgia. *See Assoc. v. Smith*, 549 S.E.2d 454, 459 (Ga. Ct. App. 2001). Plaintiff's and the Class Members' PII was publicly disclosed by Defendant in the Data Breach with reckless disregard for the reasonable offensiveness of the disclosure. Such disclosure is highly offensive and would be to any person of ordinary sensibilities. Defendant knew or should have known that Plaintiff's and the Class Members' PII is not a matter of legitimate public concern.

124.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been injured and are entitled to damages, as set forth herein.

## COUNT IV
### Breach of Contract
### (On Behalf of Plaintiff and the Class)

125.   Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

126.   NextGen entered into various contracts with its healthcare provider clients to provide software and practice management services to its clients.

127.   These contracts are virtually identical to each other and were made expressly for the benefit of Plaintiff and the Class, as it was their confidential

medical information that NextGen agreed to collect and protect through its services. Thus, the benefit of collection and protection of the PII belonging to Plaintiff and the Class were the direct and primary objective of the contracting parties.

128.  NextGen knew that if it were to breach these contracts with its healthcare provider clients, the clients' patients, including Plaintiff and the Class, would be harmed by, among other things, fraudulent misuse of their PII.

129.  PII breached its contracts with its clients when it failed to use reasonable data security measures that could have prevented the Data Breach and resulting compromise of Plaintiff's and Class Members' PII.

130.  As reasonably foreseeable result of the breach, Plaintiff and the Class were harmed by NextGen's failure to use reasonable data security measures to store their PII, including but not limited to, the actual harm through the loss of their PII to cybercriminals.

131.  Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with their costs and attorney fees incurred in this action.

## COUNT V
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class)

132.  Plaintiff incorporates by reference all other paragraphs as if fully set

forth herein.

133.   This claim is pleaded in the alternative to the breach of contract claim.

134.   Plaintiff and Class Members conferred a monetary benefit on Defendant when Defendant's clients provided Plaintiff's and Class Members' PII to Defendant, which Defendant collected.

135.   Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII.

136.   Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and the Class, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

137.   Under the principles of equity and good conscience, Defendant should not be permitted to retain the monetary value of the benefit belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

138.   Defendant acquired the monetary benefit and PII through inequitable means in that they failed to disclose the inadequate security practices previously alleged.

139.   If Plaintiff and Class Members knew that Defendant had not secured PII, they would not have agreed to have their PII provided to Defendant.

140.   Plaintiff and Class Members have no adequate remedy at law.

141.   As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including, but not limited to: (i) the loss of the opportunity how their PII is used; (ii) the compromise, publication, and/or theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (v) the continued risk to their PII, which remains in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in their continued possession and (vi) future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the PII compromised as a result of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

142.   As a direct and proximate result of Defendant's conduct, Plaintiff and

Class Members have suffered and will continue to suffer other forms of injury and/or harm.

143.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from them.

## PRAYER FOR RELIEF

Plaintiff and members of the Class demand a jury trial on all claims so triable and request that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representative, and appointing their counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

C.    Awarding injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

D.    Enjoining Defendant from further deceptive practices and making untrue statements about the Data Breach and the stolen PII;

E.  Awarding Plaintiff and the Class damages that include applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

F.  Awarding restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G.  Awarding attorneys' fees and costs, as allowed by law;

H.  Awarding prejudgment and post-judgment interest, as provided by law;

I.  Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.  Granting such other or further relief as may be appropriate under the circumstances.

## JURY DEMAND

Plaintiff hereby demand that this matter be tried before a jury.

Date: May 10, 2023

Respectfully submitted,

**ALONSO &WIRTH**

*/s/ Joseph B. Alonso*
Georgia Bar No. 013627
1708 Peachtree Street
Suite 207
Atlanta, GA 30309
Tel: (678) 928-4472
jalonso@alonsowirth.com

**TURKE & STRAUSS LLP**
Samuel J. Strauss *
Raina Borrelli *
613 Williamson Street, Suite 201
Madison, Wisconsin 53703
Telephone: (608) 237-1775
Facsimile: (608) 509-4423
sam@turkestrauss.com
raina@turkestrauss.com

*Attorneys for Plaintiff and Proposed Class*

* To Be Admitted *Pro Hac Vice*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 7.1D, the attached pleading complies with the font and point selections prescribed by Local Rule 5.1B and uses 14 point Times New Roman Font.

_/s/ Joseph B. Alonso_
Joseph B. Alonso
Georgia Bar No. 013627

# Exhibit A



**Via U.S. Mail**

**April 28, 2023**

**Patient Name**
**Street Address**
**City, State Zip code**

**Re: <u>Notice of Data Incident</u>**

Dear [Patient Name],

We are writing to let you know about a security incident involving certain of your personal information. This notice explains what happened, what information may have been affected, what measures we are taking in response, and steps you can take to protect yourself.

**Who We Are**
NextGen Healthcare, Inc. provides electronic health records and practice management solutions to doctors and medical professionals. In support of the services we provide to your medical professionals, we maintain certain of your personal information on their behalf.

**What Happened**
On March 30, 2023, we were alerted to suspicious activity on our NextGen Office system. In response, we launched an investigation with the help of third-party forensic experts. We also took measures to contain the incident, including resetting passwords, and contacted law enforcement .

Based on our in-depth investigation to date, supported by our external experts, it appears that an unknown third-party gained unauthorized access to a limited set of electronically stored personal information between March 29, 2023 and April 14, 2023. As a result of our detailed analysis of the information impacted, we recently determined that certain of your personal information was included in the electronic data accessed during the incident.  Below we have provided information about what information was involved, what we are doing in response, and what you can do to proactively protect yourself.

**What Information Was Involved**
The personal information contained in the electronic data accessed during the incident included your name, date of birth, address, and social security number. Importantly, our investigation has revealed no evidence of any access or impact to any of your health or medical records or any health or medical data. Furthermore, there is no evidence to suggest there has been any fraudulent use of the personal information accessed.

**What We Are Doing**
As noted, as soon as we discovered the suspicious activity, we launched an internal investigation and engaged the assistance of leading forensic experts. At the same time, we took measures to contain the incident, including resetting passwords, and further reinforcing the security of our systems.  We also contacted law enforcement, and have been working with them since.

We take this matter very seriously, and in addition to the steps already described, NextGen Healthcare is offering you **24 months** of **free fraud detection and identity theft protection** through Experian's®

IdentityWorks℠ product. If you wish to take advantage of these services, activation instructions are below.

**What You Can Do**
Though we have no evidence that any of your personal information has been fraudulently used, we encourage you to remain vigilant by reviewing your account statements and credit reports closely. At the end of this letter, we have provided you with additional information regarding steps you can proactively take to further protect yourself and your personal information. It describes information about (1) reporting suspicious activity or suspected identity theft, (2) credit reports, (3) fraud alerts, (4) credit/security freezes, (5) your rights under the Fair Credit Reporting Act, and (6) information about taxes. We encourage you to review that additional information.

***Free Credit Monitoring and Identity Theft Protection***: Even though we have no evidence that your personal information has been fraudulently used, as a precautionary measure, we are offering to provide you with 24 months of free identity monitoring, fraud consultation, and identity theft restoration services through Experian's IdentityWorks℠ product. To take advantage of these free services, please follow the steps below:

- Ensure that you enroll by **July 31, 2023.** Your code will not work after this date.
- Visit the Experian IdentityWorks℠ website to enroll: https://www.experianidworks.com/credit
- Provide your activation code: **[ABCDEFGH]**

If you have questions about the product or need assistance with identity restoration that arose as a result of this incident, please contact Experian's customer care team at (800) 984-8279 by July 31, 2023**.** Please be prepared to provide engagement number **B090760** as proof of eligibility for the identity restoration services by Experian.

**For More Information**
We take very seriously the security and privacy of your information, and deeply regret any inconvenience this may cause. If you have any questions, please call us 800-984-8279toll-free Monday through Friday from 8 am – 10 pm Central, or Saturday and Sunday from 10 am – 7 pm Central (excluding major U.S. holidays). Please be prepared to provide your engagement number B090760.

Sincerely,

David Slazyk
Chief Information & Security Officer

**<u>Additional Steps You Can Take to Protect Your Personal Information</u>**

***Report Suspicious Activity or Suspected Identity Theft.*** If you detect any unauthorized or suspicious activity on an account, you should promptly notify the financial institution or company with which the account is maintained. If you suspect any identity theft has occurred, you can contact your local law enforcement by filing a police report or the Federal Trade Commission (FTC) by calling 1-877-ID-THEFT (1-877-438-4338), by writing to the FTC at 600 Pennsylvania Avenue, NW Washington DC 20580, or online at www.ftc.gov. You can also contact your state Attorney General (information for some specific AGs is listed below):

- District of Columbia residents may wish to review information provided by the District of Columbia Attorney General on steps to take to avoid identity theft at https://oag.dc.gov/, emailing at consumer.protection@dc.gov, calling (202) 442-9828, or by writing to Office of the Attorney General, Office of Consumer Protection, 400 6th Street, NW, Washington, DC 20001.

- Maryland residents may wish to review information provided by the Maryland Attorney General on how to avoid identity theft at http://www.oag.state.md.us, by sending an email to idtheft@oag.state.md.us, or by calling 410-576-6491.

- New York residents may wish to review information on security breach response and identity theft prevention and protection information provided by the New York Attorney General at https://ag.ny.gov/internet/privacy-and-identity-theft or by calling 1-800-771-7755 and by the New York Department of State, Division of Consumer Protection at https://dos.ny.gov, or by calling 800-697-1220.

- North Carolina residents may wish to review information provided by the North Carolina Attorney General at http://www.ncdoj.gov/, by calling 877-566-7226, or by writing to 9001 Mail Service Center, Raleigh, NC 27699.

- Rhode Island resident may wish to review information provided by the Rhode Island Attorney General at http://www.riag.ri.gov or by calling 401-274-4400, or by writing to 150 South Main Street, Providence, RI 02903.

***Contacting the Internal Revenue Service***: If you believe you are the victim of tax fraud or that somebody has filed or accessed your tax information, you should immediately contact the IRS or state tax agency as appropriate. For the IRS, you can use Form 14039 (https://www.irs.gov/pub/irs-pdf/f14039.pdf). You can also call them at 800-908-4490 (Identity Theft Hotline). Information on how to contact your state department of revenue to make similar reporting may be found by going to http://www.taxadmin.org/state-tax-agencies.

***Credit Reports/Fraud Alerts/Credit and Security Freezes***: Under federal law, you are entitled to one free copy of your credit report every 12 months. You can request a free credit report once a year at www.annualcreditreport.com, by calling (877) 322-8228, or by completing an Annual Credit Report Request Form and mailing it to Annual Credit Report Request Service, P.O. Box 105281, Atlanta, GA 30348. If you discover inaccurate information or a fraudulent transaction on your credit report, you have the right to request that the consumer reporting agency delete that information from your credit report file.

As a precautionary step, to protect yourself from possible identity theft you can place a fraud alert on your bank accounts and credit file. A fraud alert tells creditors to follow certain procedures before opening a new account in your name or changing your existing account. You may call any one of the three major

credit bureaus listed below to place a fraud alert on your file.  As soon as one credit bureau confirms your fraud alert, the others are notified to place fraud alerts on your file.  All three credit reports will be sent to you, free of charge, for your review.

In some US states, you have the right to put a security freeze on your credit file.   A security freeze (also known as a credit freeze) makes it harder for someone to open a new account in your name.  A security freeze is designed to prevent potential creditors from accessing your credit report without your consent.  As a result, using a security freeze may interfere with or delay your ability to apply for a new credit card, loan, wireless phone, or any service that requires a credit check.  You must separately place a security freeze on your credit file with each credit reporting agency.  To place a security freeze on your file you may be required to provide the consumer reporting agency with information that identifies you including your Social Security Number.  There may be a fee for this service based on state law (in MA, there shall be no charge).  To put a security freeze on your credit file contact the consumer reporting agencies listed below.

You may contact the three U.S. credit reporting agencies as follows:

| Agency | Credit Report Contact | Fraud Alert Contact | Credit/Security Freeze Contact |
|---|---|---|---|
| TransUnion LLC | TransUnion LLC Consumer Disclosure Center, P.O. Box 1000, Chester, PA 19016; (800) 888-4213; https://www.transunion.com | TransUnion Fraud Victim Assistance, P.O. Box 2000, Chester, PA 19016; (800) 680-7289; https://www.transunion.com/fraud-victim-resource/place-fraud-alert | P.O. Box 160, Woodlyn, PA 19094; (888) 909-8872; https://www.transunion.com/credit-freeze/ |
| Experian | P.O. Box 2002, Allen, TX 75013; (888) 397-3742; https://www.experian.com/consumer-products/free-credit-report.html | Experian, P.O. Box 9554, Allen, TX 75013; (888) 397-3742; https://www.experian.com/fraud/center.html | P.O. Box 9554, Allen, TX 75013; (888) 397-3742; https://www.experian.com/freeze/center.html |
| Equifax Information Services LLC | Equifax Information Services LLC, P.O. Box 740241, Atlanta, GA 30374; (866) 349-5191; https://www.equifax.com/personal/credit-report-services/ | Equifax Information Services LLC, P.O. Box 105069, Atlanta, GA 30348-5069; (800) 525-6285; https://www.equifax.com/personal/credit-report-services/ | Equifax Information Services LLC, P.O. Box 105788, Atlanta, GA 30348-5788; (888) 298-0045 or (800) 349-9960; https://www.equifax.com/personal/credit-report-services/ |

*Federal Fair Credit Reporting Act rights*: You have rights under the federal Fair Credit Reporting Act that include, among others, the right to know what is in your file; to dispute incomplete or inaccurate information; and to have consumer reporting agencies correct or delete inaccurate, incomplete, or unverifiable information. More information about your rights is at www.ftc.gov.

*IRS Identity Protection PIN*: The IRS offers an Identity Protection PIN, which is a six digit number that prevents someone else from filing a tax return using your Social Security number. The Identity Protection PIN is known only to you and the IRS. For more information and to obtain an Identity Protection PIN, please visit the IRS website at https://www.irs.gov/identity-theft-fraud-scams/get-an-identity-protection-pin.